IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
STATESBORO DIVISION

THEOWANDA LAMB,

    Plaintiff,

vs.

CIVIL ACTION NO.: CV608-093

DANE DASHER and
JOHNNY KENNEDY,

    Defendants.

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff, who is currently incarcerated at Hays State Prison in Trion, Georgia, filed a cause of action pursuant to 42 U.S.C. § 1983 contesting certain conditions of his confinement while he housed at Georgia State Prison in Reidsville, Georgia. Defendants Dasher and Kennedy ("Defendants") filed a Motion for Summary Judgment, to which Plaintiff responded. Defendants filed a Reply. For the reasons which follow, Defendants' Motion should be **GRANTED**.

## STATEMENT OF THE CASE

Plaintiff asserts that Defendant Kennedy, the disciplinary hearing officer for his attempted escape charges, did not allow him to call any witnesses during the hearing. In addition, Plaintiff contends Defendant Dasher ordered an officer to place him in lockdown and that he was in lockdown for over ten (10) months.

Defendants allege that Plaintiff has not established any violation of his right to due process. Defendants also allege that they are entitled to qualified immunity.

AO 72A
(Rev. 8/82)

## **STANDARD OF REVIEW**

Summary judgment should be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving part[ies are] entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); Midrash Sephardi, Inc. v. Town of Surfside, 366 F.3d 1214, 1223 (11th Cir. 2004). An issue of fact is "material" if it might affect the outcome of the case, and an issue of fact is "genuine" when it could cause a rational trier of fact to find in favor of the nonmoving party. Hickson Corp. v. Northern Crossarm Co., Inc., 357 F.3d 1256, 1259-60 (11th Cir. 2004). The court must determine "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Id. at 1260 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

The moving parties bear the burden of establishing that there is no genuine issue of material fact and that they are entitled to judgment as a matter of law. Williamson Oil Co., Inc. v. Philip Morris USA, 346 F.3d 1287, 1298 (11th Cir. 2003). Specifically, the moving parties must identify the portions of the record which establish that there are no genuine issues of material fact. Hickson, 357 F.3d at 1260 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). When the nonmoving party would have the burden of proof at trial, the moving parties may discharge their burden by showing that the record lacks evidence to support the nonmoving party's case or that the nonmoving party would be unable to prove his case at trial. Id. In determining whether a summary judgment motion should be granted, a court must view the record and all reasonable

inferences that can be drawn from the record in a light most favorable to the nonmoving party. Acevado v. First Nat'l Bank, 357 F. 3d 1244, 1247 (11th Cir. 2004).

## DISCUSSION AND CITATION TO AUTHORITY

I. **Procedural Due Process**

Defendants contend that Plaintiff was served with a disciplinary report on January 9, 2008, which charged him with attempted escape the previous day. Defendants also contend that Dexter Taylor ("Taylor") conducted the investigation of Plaintiff's disciplinary report, and he met with Plaintiff on January 23, 2008. Defendants allege that Taylor informed Plaintiff of his rights, including his right to request witnesses and an advocate, gave Plaintiff the opportunity to ask questions, and gave Plaintiff an Inmate Rights Statement. Defendants state that Plaintiff did not request any witnesses, but he did request to have an advocate at his hearing. Defendants assert that, after Plaintiff was informed of his rights, Taylor interviewed him and recorded his statement. Defendants also assert that Plaintiff did not request any witnesses, so Taylor did not record any witness' statement. Defendants further assert that Mr. Reardon (Plaintiff's advocate) met with Plaintiff on the morning of January 24, 2008, and Plaintiff explained to Reardon that he believed Lieutenant Wagner did not see Plaintiff doing any act for which he was charged. Defendants allege that Plaintiff did not indicate to Reardon that he wished to call Lieutenant Wagner as a witness. Defendants contend that Lieutenant Wagner wrote a statement, which indicated that he agreed with the factual statement contained in the disciplinary report. Defendants aver that Taylor completed his investigation of Plaintiff's disciplinary report and recommended that Plaintiff be referred for a disciplinary hearing. Defendants assert that Defendant Kennedy conducted this

hearing on January 31, 2008, and Reardon was present during the hearing. Defendants also assert that Plaintiff did not have any live witness testimony at this hearing, nor did he indicate his desire for such testimony. However, Defendants state that, even if Plaintiff had desired to have Lieutenant Wagner as a witness, he "would not likely" have been permitted based on security concerns and because Wagner would not have given testimony supportive of Plaintiff's defense. (Doc. No. 41-2, p. 6). Defendants assert that Defendant Kennedy found Plaintiff guilty of attempted escape, unauthorized possession of an escape device, and possession of unauthorized clothing after Kennedy read all of the evidence and heard from Plaintiff.

Plaintiff asserts that he gave Taylor a statement on January 23, 2008, in which Plaintiff denied the charges against him. Plaintiff also asserts that Taylor told him that he would not pursue the disciplinary report, but Warden Upton and Defendant Dasher wanted to adjudicate the matter. Plaintiff alleges that Taylor's "primary purpose as an investigator was to find out whether there was reasonable cause to show that Plaintiff had committed an infraction, which there was not, as evidenced by his admission to Plaintiff that he, himself, would have the [disciplinary report] dismissed[.]" (Doc. No. 47, p. 6). Plaintiff contends that he had never seen Reardon before Defendant Kennedy arrived at his cell to conduct the disciplinary hearing and that the record shows that Reardon did not meet with Plaintiff on January 24, 2008. Plaintiff asserts that Defendant Kennedy read the charges and factual statement at the hearing, but he did not read any witness statements, inmate rights forms, or any other document. Plaintiff also asserts that Defendant Kennedy asked him what he had to say about his charges, and Plaintiff professed his innocence. Plaintiff also asserts that he told Defendant

4

Kennedy he wished to exercise his right to have a witness (Lieutenant Wagner) testify, but Defendant Kennedy told him that he was not going to be able to do so. Plaintiff further asserts that he appealed to Reardon, as his advocate, to assist him with his defense, but he did not.[1] Plaintiff alleges that Defendant Kennedy's finding of guilt at this hearing was not based on substantial evidence, as the only evidence Defendant Kennedy relied on was the "uncorroborated factual statement" Lieutenant Wagner reported in the disciplinary report. (Doc. No. 47, p. 15).

Defendants assert that the Inmate Rights Statement "that Plaintiff concedes he signed, clearly states that he did not wish to request any witnesses." (Doc. No. 51, p. 6). Defendants allege that Plaintiff does not dispute that he received advance written notice of the charges or that he was given a written statement of the reasons for the disciplinary action which was taken. Defendants also allege that, even if Plaintiff had requested to have Lieutenant Wagner as a witness, he would not have testified at the hearing because of safety concerns and because Lieutenant Wagner's testimony would have been non-supportive of Plaintiff's defense. Defendants contend that, to the extent Plaintiff attempts to raise new claims based on the sufficiency of the evidence presented at the hearing and the adequacy of his advocate, he cannot do so at this time.

An inmate states a cognizable claim for the deprivation of his procedural due process rights under the Fourteenth Amendment when he alleges the deprivation of a constitutionally protected liberty or property interest, state action, and constitutionally inadequate process. Shaarbay v. Palm Beach Co. Jail, 350 F. App'x 359, 361 (11th Cir.

---

[1] Plaintiff spends a great deal of time discussing the charges he faced at the hearing, but these contentions are immaterial to whether Plaintiff's right to due process was violated by Defendant Kennedy at this hearing.

5

2009) (citing Cryder v. Oxendine, 24 F.3d 175, 177 (11th Cir. 1994)). Constitutionally adequate process requires compliance with the minimum due process protections accorded to an inmate in prison disciplinary proceedings: (1) the right to receive written notice of the charges against him at least 24 hours before his hearing; (2) the right to call witnesses and present documentary evidence, where doing so would not be unduly hazardous to institutional safety or correctional goals; and (3) the right to receive a written statement setting forth the disciplinary committee's findings of fact. Asad v. Crosby, 158 F. App'x 166, 173 (11th Cir. 2005) (citing Wolff v. McDonnell, 418 U.S. 539, 563-66 (1974)). In addition, the Supreme Court has held that a finding of "some evidence" in the record to support the decision of a prison disciplinary board is necessary to satisfy the requirements of due process. Kenney v. Barron, 239 F. App'x 494, 495 (11th Cir. 2007) (quoting Superintendent, Massachusetts Corr'l Inst. v. Hill, 472 U.S. 445, 455 (1985)). The determination of whether the standard is satisfied merely requires inquiry into "whether there is any evidence in the record that could support the conclusion reached by the disciplinary board." Id. at 495-96 (quoting Hill, 472 U.S. at 455).[2]

The evidence before the Court reveals the following:

Taylor, the investigator of the disciplinary report charges, states in his Affidavit that he reviewed the Inmate Rights Statement with Plaintiff on January 23, 2008. Taylor declares that Plaintiff indicated that he wanted an advocate but did not request any witnesses. Taylor also declares that Plaintiff said he understood his explanation of the

---

[2] Plaintiff does not appear to contest that he received proper notification of the disciplinary charges he faced or that he received written notification of the disciplinary committee's findings. Rather, Plaintiff contests that he was denied his right to call witnesses at his disciplinary hearing and that there was no evidence to support the committee's findings. Thus, the undersigned limits his discussion to these two (2) prongs of the procedural due process analysis.
AO 72A (Rev. 8/82)

6

disciplinary process and signed the Inmate Rights Statement. Taylor states that Plaintiff made a statement in response to the disciplinary charges, which Taylor wrote down, and denied involvement in the alleged escape attempt and said that Lieutenant Wagner did not see Plaintiff on the date in question. According to Taylor, he reviewed Plaintiff's statement and "other evidence collected in the investigation" and interviewed Lieutenant Wagner based on Plaintiff's statement. (Doc. No. 41-49, p. 6). Taylor states that Lieutenant Wagner wrote a statement indicating that he "continued to agree with the factual statement set forth in Disciplinary Report # 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." (Id. at p. 7). Taylor states that he referred Plaintiff for a hearing because he agreed with the factual statement set forth in the disciplinary report and forwarded his investigation report to the Disciplinary Hearing Officer on January 31, 2008.

In his Affidavit, Plaintiff's advocate at the hearing, Rusty Reardon ("Reardon"), avers that his job as an advocate was to "ensure that the inmate understands the disciplinary process and that the proper procedure is followed[,]" but an advocate "does not make extraordinary efforts to secure an inmate's acquittal." (Doc. No. 41-55, p. 3). Reardon states that he met with Plaintiff on January 24, 2008, and Plaintiff told him his belief that Lieutenant Wagner did not see him commit any of the acts for which he was being charged and that the charges did not apply to him. Reardon also states that Plaintiff did not indicate that he wanted Lieutenant Wagner or anyone else called as a witness during the hearing, but, if Plaintiff had, Reardon would have made note of this on the advocate form. Reardon further states that he did not "observe any procedural errors[ ]" at the hearing, and Plaintiff was told he had the right to appeal the Disciplinary Hearing Officer's decision. (Id. at p. 6).

7

AO 72A
(Rev. 8/82)

Defendant Kennedy was Plaintiff's Disciplinary Hearing Officer on January 31, 2008. Defendant Kennedy declares in his Affidavit that Lieutenant Wagner was the reporting official for the disciplinary report written against Plaintiff. Defendant Kennedy states that he read the factual statement and charges, the Inmate Rights Statement, the incident report, and Lieutenant Wagner's witness statement aloud. Defendant Kennedy also states that Plaintiff did not request any witnesses in his Inmate Rights Statement, nor did he request to have any witnesses at his disciplinary hearing. According to Defendant Kennedy, Lieutenant Wagner was documented on the use of witness form because the investigator obtained a witness statement from him. Defendant Kennedy avers that Plaintiff did not request to have Lieutenant Wagner as a witness, but, if he had, Wagner's live testimony "would not likely have been permitted" because Wagner's testimony was not supportive of Plaintiff's defense and because of security concerns at GSP. (Doc. No. 41-40, p. 12). Defendant Kennedy states that he found Plaintiff guilty of attempted escape, unauthorized possession of an escape device, and possession of unauthorized clothing, "based on the information contained in the factual statements and investigation summary." (Id. at p. 14).

Defendants submitted a copy of Disciplinary Report Number 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, which charged Plaintiff with attempted escape, unauthorized possession of an escape device, and possession of unauthorized clothing. Lieutenant Wagner, who was the reporting official, provided the following factual statement:

> While doing a security check I observed a homemade rope made of food tray straps tied together, hanging from the top of D-West roof from one end and the other end of the rope was thrown across the inside perimeter fence in Zone 1. Capt. Andy Benjamin was then notified of a possible escape attempt and an Emergency Count was called. At this time [Plaintiff]. . . [was] discovered on the A1 & A2 small yard. Also on the yard

were dyed state clothing and additional food tray straps. [Plaintiff was] strip searched and secured in [his cell].

(Doc. No. 41-41, pp. 2-3).

Defendants also submitted a copy of the Inmate Rights Statement, which informed Plaintiff of his rights before his disciplinary hearing. This Statement informed Plaintiff that he could request an advocate at the hearing and to have witnesses on his behalf, and that he could make a statement if he desired. This Statement also included: "I, the undersigned inmate, have read or have had read to me the above rules and I understand them." (Doc. No. 41-52, p. 2). This Statement indicated that Plaintiff requested an advocate, but no witnesses with the space for "Names of Witnesses Requested" left blank. Plaintiff signed this Statement, which was dated January 23, 2008. (Id.). Plaintiff provided a statement to Taylor during his investigation, and Plaintiff indicated that Lieutenant Wagner did not see him do any of the infractions with which Plaintiff was charged. (Doc. No. 41-53, p. 2). In response to a statement request from the Office of Inmate Discipline (i.e., Taylor), Lieutenant Wagner wrote that he concurred with the factual statement contained in the disciplinary report. (Doc. No. 45-45, p. 2). Finally, on the Advocate Form dated January 24, 2008, Reardon noted, "Did [Lt. Wagner] observe [inmate] doing any of the things he's charged with?" and "[Inmate] stated he was on the yard and that none of the charges apply to him." (Doc. No. 41-54, p. 2). Plaintiff refused to sign this form.

Plaintiff, in his Affidavit, states that Taylor asked him for a statement on January 23, 2008, which Plaintiff provided, denied the charges, and argued that Lieutenant Wagner's factual statement was insufficient. Plaintiff also states that he requested an advocate and to have Lieutenant Wagner called as a witness at the hearing. Plaintiff

9

further states that Defendant Kennedy came to his cell on January 31, 2008, to conduct the disciplinary hearing and read the charges and factual statement from the disciplinary report. Plaintiff avers that Defendant Kennedy did not read any witness statements, inmate rights form, or any other documents he claimed to have read during the hearing. Plaintiff states that he told Defendant Kennedy he was not guilty of the charges. Plaintiff also states that he told Defendant Kennedy that he had the right to call a witness to testify in his defense, and Defendant Kennedy told him he did not. Plaintiff further states that, on appeal, the charges of possession of unauthorized clothing and unauthorized possession of an escape device were expunged as being unsupported by the evidence. (Doc. No. 47, pp. 27-29).[3]

Defendant Kennedy found Plaintiff guilty of the charges in Disciplinary Report Number 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 based on the factual statement contained in this report and the investigative report, which contained a statement by Lieutenant Wagner affirming the factual statement he made in the disciplinary report, and the incident report. Thus, there was "some evidence" in the record to support Defendant Kennedy's finding of guilt. Kenney, 239 F. App'x at 495. It is of no consequence that two of the three charges Plaintiff was found guilty of were expunged on appeal. See Baker v. Rexroad, 159 F. App'x 61, 63 (11th Cir. 2005) (noting that, even if the plaintiff suffered a procedural due process deprivation, this deprivation was cured by utilizing the appeals process). Moreover, accepting as true Plaintiff's contention that he requested to have Lieutenant Wagner called as a witness during the hearing, Plaintiff has not met his burden of showing a due process violation. Defendant Kennedy noted on the Hearing

---

[3] Plaintiff's remaining documentation is either duplicative of documentation Defendants submitted or appears to be irrelevant to the issues before the Court.

Documentation Form that Lieutenant Wagner was not called as a witness because "calling of the witness would be non-supportive of the inmate's defense." (Doc. No. 41-47, p. 2). This is a permissible reason, per Standard Operating Procedure IIB02-0001, to have excluded Lieutenant Wagner as a witness during the disciplinary hearing. (Doc. No. 41-42, p. 21).[4] Plaintiff has failed to establish the existence of a genuine issue of material fact regarding his contention that Defendant Kennedy violated his right to due process during the disciplinary proceedings. This portion of Defendants' Motion should be **GRANTED**.

II. **Substantive Due Process**

Defendants aver that Plaintiff's claims regarding his placement in administrative segregation and high maximum custody are without merit. Defendants assert that Plaintiff does not set forth any specific instances of atypical or significant hardship while he was housed in administrative segregation or high maximum security. Defendants also assert that Plaintiff's conclusory allegation that he was denied privileges of an ordinary prisoner fails to state a claim as a matter of law. Defendants contend that the evidence establishes that Defendant Dasher did not make the decision whether Plaintiff remained in administrative segregation, nor did he decide whether Plaintiff was classified as high maximum security. Defendants allege that conditions in administrative segregation and high maximum custody are not punitive in nature and are not dramatic departures from the ordinary conditions of confinement. Defendants

---

[4] The evidence indicates that, assuming Plaintiff requested Lieutenant Wagner to be called as a witness, his request was made at the hearing. This appearing to be the case, it was in Defendant Kennedy's discretion to allow Lieutenant Wagner to testify. (Doc. No. 41-42, p. 21). In addition to Defendant Kennedy noting that Lieutenant Wagner's testimony being non-supportive of Plaintiff's defense, Defendant Kennedy noted that calling Lieutenant Wagner would have jeopardized prison security. (Doc. No. 41-40, p.12). This is another permissible reason to exclude a requested witness. (Doc. No. 41-42, p. 21).

11

also allege that the extended duration of Plaintiff's time in administrative segregation and high maximum custody "does not distinguish the facts of his case from other administrative segregation situations in which it was held that no liberty interest existed." (Doc. No. 41-2, p. 24) (collecting cases). Defendants assert that the conditions and privileges of administrative segregation and high maximum security were the same as those afforded the general population. Defendants also assert that: Plaintiff's cell was maintained, equipped, and furnished similarly to the cells in general population; Plaintiff had the same access to personal hygiene, except that he was limited to three (3) showers a week; and he received the same quality of food, correspondence privileges, bedding supplies, and a minimum of five (5) outdoor exercise hours per week, just as inmates in general population. Defendants further assert that Plaintiff was able to keep all of his personal property, to order items from the commissary, to participate in educational, vocational, and rehabilitative programs, and to have restricted, "no contact" visitation privileges while he was in administrative segregation and high maximum custody. (Id. at 26). Defendants further assert Plaintiff had a television in his cell, unlike inmates in general population, which was confiscated for a couple of months because he kept hiding it. Defendants allege that Plaintiff had a Special Management Hearing before he was placed on high maximum custody, and he was removed from high maximum custody before he was due for his yearly review. Upon his removal from high maximum security, Defendants aver, Plaintiff's security status was reduced to "close" security. (Id. at 27). Defendants also aver that Plaintiff remained in administrative segregation on account of his security status because, at that time, only minimum and medium security inmates were housed in the general population at GSP.

Defendants further aver that Plaintiff received monthly reviews for the remainder of his incarceration at GSP, in accordance with prison procedures.

Plaintiff states that he was in isolation for 42 days and was not allowed to have visits during that time, per policy. Plaintiff contends that his regular visitation privileges were not restored until August 2008, after his family made telephone calls and spoke with Defendant Dasher personally. Plaintiff also contends that he was given a television for the first time on September 9, 2008, after he wrote Defendant Dasher a letter informing him that he had been denying Plaintiff "access to the media" for nine (9) months. (Doc. No. 47, p. 5). Plaintiff asserts that he remained in an isolation cell for 42 consecutive days without being released outside of isolation after 30 days, in violation of procedure. Plaintiff alleges that, when he was housed in general population, prisoners who were classified as close and maximum security were housed in general population. Plaintiff also alleges that, even with the false attempted escape charge, his custody level, based on score, was medium.

Defendants contend that the only specific assertions Plaintiff makes regarding the alleged denial of privileges is that he was denied visitation privileges entirely until April 13, 2008, and contact visits until August 2008, and that he did not have a television in his cell. Defendants assert that Plaintiff was not entitled to visitation privileges during his 42 days in isolation, which left him without visitation for "only a few weeks." (Doc. No. 51, p. 8). Defendants also assert that Plaintiff concedes that he had non-contact visits before August 2008. Defendants further assert that Plaintiff's lack of a television, viewed in conjunction with all of the evidence, does not demonstrate the need for due process protections. Defendants allege that Plaintiff does not dispute anything

concerning the privileges he did have while he was housed in administrative segregation and high maximum security. Finally, Defendants allege that, "notwithstanding the extended duration of Plaintiff's time spent" in administrative segregation and high maximum security, Plaintiff fails to establish a liberty interest implicating any due process protections. (Id. at 9).

"The Due Process Clause protects against deprivations of 'life, liberty, or property without due process of law.'" Kirby v. Siegelman, 195 F.3d 1285, 1290 (11th Cir. 1999) (quoting U.S. CONST. AMEND. XIV). The Supreme Court has identified two situations in which a prisoner can be deprived of liberty such that the protection of due process is required: (1) there is a change in the prisoner's conditions of confinement so severe that it essentially exceeds the sentence imposed by the court; and (2) the State has consistently given a benefit to prisoners, usually through a statute or administrative policy, and the deprivation of that benefit "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Id. at 1290-91 (quoting Sandin v. Conner, 515 U.S. 472, 484 (1995)).

In Sandin, the United States Supreme Court addressed whether the punishment inmate Conner received for a disciplinary violation was sufficient to invoke a liberty interest protected by the Due Process Clause. 515 U.S. at 472. Following a disciplinary conviction, Conner received 30 days' disciplinary segregation in a Special Housing Unit. Id. at 475. After noting that the segregation was a form of punishment, the Court concluded that it was not a dramatic departure from the conditions of Conner's indeterminate sentence. Id. at 485. The Court determined that the conditions of disciplinary segregation at the prison where Conner was incarcerated were virtually

14

indistinguishable from the conditions of administrative segregation and protective custody. Id. at 486. Also, the Court noted that the conditions of disciplinary segregation were not markedly different from the conditions in general population. Id. The Court concluded that the conditions of disciplinary segregation did not impose an "atypical, significant deprivation in which a State might conceivably create a liberty interest." Id. Thus, the Court determined that Conner was not entitled to due process protection. Id. at 487.

Defendant Kennedy states in his Affidavit that he determined that Plaintiff committed infractions of the "greatest severity level" and recommended that he receive 42 days' isolation, after he consulted "the authorized sanction list[.]" (Doc. No. 41-40, p. 15). Defendant Kennedy also states that Defendant Dasher, the Warden's designee, approved his findings and recommended action. (Id. at p. 16). Defendant Dasher states in his Affidavit that Plaintiff remained in the same cell as he was in during administrative segregation once he was placed on isolation status. Defendant Dasher also states that Plaintiff's privileges while he was on isolation status were restricted compared to those for inmates on administrative segregation or high maximum custody. However, Defendant Dasher specifically states that Plaintiff "consistently received meals, showers and exercise" when he was on isolation status. (Doc. No. 41-3, p. 12). Defendant Dasher generally states that inmates on isolation status receive the same mail privileges as inmates in general population, unless those privileges were revoked; disciplinary cells are "maintained in a sanitary condition" and are furnished and equipped similarly to cells in the general population; inmates on disciplinary isolation status have the same personal hygiene opportunities, except that those inmates may be

15

limited to shaving and showering three (3) times a week; and inmates on disciplinary isolation status are provided with at least five (5) hours of exercise a week and receive the same quality and quantity of food and the same bedding supplies as inmates in general population. (Id. at pp. 11-12). Defendant Dasher declares that, though inmates on disciplinary isolation status cannot attend religious services, they are able to access the chaplain and other religious volunteers. Defendant Dasher avers that inmates in disciplinary isolation generally are not allowed telephone or visitation privileges, nor are they allowed to go to the commissary other than to buy personal hygiene items. (Id. at p. 13; see also Doc. No. 41-22, pp. 3-5). Defendant Dasher declares that Plaintiff was taken off disciplinary isolation status on March 20, 2008, and the privileges consistent with high maximum custody[5] were restored. Defendant Dasher also declares that Plaintiff changed cells within the dormitory based on institutional needs on July 1, 2008, but he remained on high maximum custody. On January 12, 2009, Defendant Dasher avers, Plaintiff's security status was reduced to close security, but he could not be housed with inmates in the general population at GSP because, at the time, only minimum and medium security inmates were housed in general population. Defendant Dasher states that, due to Plaintiff's security status, he was housed in administrative segregation for the remainder of his incarceration at GSP, and he continued to receive privileges consistent with administrative segregation (e.g., meals, showers, exercise,

---

[5] Steve Upton was the Warden at GSP during the relevant time. In his Affidavit, Mr. Upton declared that he approved the Classification Committee's recommendation that Plaintiff be placed on high maximum custody based on Plaintiff's attempted escape from a maximum security facility, he was serving a life sentence for murder, and because Mr. Upton believed Plaintiff to be a serious threat to public safety. (Doc. No. 41-28, p. 5).

AO 72A
(Rev. 8/82)

and regular visitation).[6] Defendant Dasher also states that Plaintiff had visitation during his time in administrative segregation and high maximum custody, but, because Plaintiff had attempted an escape and cash was found in his cell, his visits were limited to "no contact" visits until August 17, 2008, when Warden Upton reinstated Plaintiff's regular visitation. (Id. at p. 9). Defendant Dasher further states that inmates housed in administrative segregation or high maximum custody where Plaintiff was housed (in K-Dormitory) had televisions in their cells. Defendant Dasher declares that, although Plaintiff told him on September 3, 2008, that he had been without a television since January 8, 2008, Defendant Dasher learned that Plaintiff's television was taken away a couple of months earlier because Plaintiff was hiding his television under his bed after being told not to do so. Defendant Dasher also declares that he spoke with Plaintiff about returning his television but warned him the television would be taken away again if he did not stop hiding it.

In his Affidavit, Plaintiff avers that Defendant Dasher told the Unit Manager to put him in K-building lockdown, to take the television out of Plaintiff's cell, and to take away Plaintiff's visitation privileges on January 8, 2008. Plaintiff also avers that he was not allowed any visits at all until April 13, 2008, when Mr. Upton approved no-contact visits after his family called several times about Plaintiff's lack of visitation privileges. Plaintiff further avers that his regular visitation privileges were not restored until August 8, 2008.

---

[6] According to Defendant Dasher, inmates who are awaiting a disciplinary hearing may be placed in administrative segregation, pursuant to Standard Operating Procedure IIB09-0001. Plaintiff was placed in administrative segregation on January 8, 2008, and remained there until January 15, 2008, at which time he was placed on high maximum custody status. (Doc. No. 41-3, p. 6). The conditions in an administrative segregation cell, as detailed by Defendant Dasher, are consistent with the conditions for inmates on disciplinary isolation status discussed above, except that inmates in administrative segregation usually have the same visitation privileges as inmates in general population and are able to keep all of their personal property. (Id. at pp. 5-6; Doc. No. 41-10, pp. 1, 5-7). In addition, Defendant Dasher states that the conditions and privileges for inmates on high maximum custody are the same as those for inmates in the general population. (Doc. No. 41-3, p. 8).

17

Plaintiff declares that he was given a television for the first time on September 9, 2008, after he wrote Defendant Dasher about being denied access to the media for nine (9) months. (Doc. No. 47, pp. 26-27). Plaintiff states that he remained on lockdown for 15 months after he completed 42 days in isolation for the sole purpose to punish him. Plaintiff also states that the food served to him while he was on lockdown was "unseasoned and bland", cold, and "extremely hard to take down because of its bad taste." (Id. at p. 30). Plaintiff further states that the food portions he was served while he was on lockdown were so small that he lost 15-20 pounds. Plaintiff further states that he was forced to eat off dirty food trays and trays with holes in them that held dirty dish water. Finally, Plaintiff states that he became sick because of the "feeding practices on lockdown, and because of the stigma on lockdown prisoners", he could not receive medical assistance despite making several written requests. (Id.).

Plaintiff testified during his deposition that, while he was on disciplinary isolation status, his cell had a bed and a sink, he was given meals, and he was able to take showers, but he was not able to write anything because his paper and pencils were confiscated. (Doc. No. 41-27, p. 28). After his time on disciplinary isolation status was over, Plaintiff remained in the same cell and was placed in administrative segregation. Plaintiff testified that conditions in administrative segregation were the same as those for disciplinary isolation, except that he was able to have his personal property returned to him, he was able to write, and could order items from the commissary. (Id. at pp. 30-31). Plaintiff also testified that he was not able to have any visitors for a little over a month, beginning on January 8, 2008, when he was placed on disciplinary isolation status; after that time, he was allowed to have no contact visits. (Id.). Plaintiff also

18

testified that he did not have a television in his cell until September 2008 and that he had been without a television for over nine (9) months.

The evidence before the Court reveals that the conditions and privileges in disciplinary isolation and administrative segregation at GSP were not markedly different than those for inmates in the general population. Plaintiff's main complaints appear to be that he was not allowed visitation privileges for the 42 days he was in isolation and that he had no-contact visits for approximately four (4) months after that and that he was without a television for nine (9) months. However, there is evidence that Plaintiff received a visit on February 16, 2008, from his mother, two (2) nephews, and three (3) nieces, and this visit began at 11:42 a.m. and lasted until 1:10 p.m. (Doc. No. 41-17, p. 2). Beginning in April 2008, Plaintiff had, on average, one (1) visit per month with his mother, his sister, and/or his nieces and nephews. (Id. at pp. 3-15). Thus, the evidence reveals that, at most, Plaintiff was not allowed any visitation for approximately one and one-half (1½) months. Plaintiff's contention that being without a television for nine (9) months constitutes a due process violation is without merit. According to Defendants, inmates in general population did not have televisions in their cells, unlike Plaintiff, who was housed in the K-dormitory during his administrative segregation. (Doc. No. 41-1, p. 18). Finally, Plaintiff's assertion that the quality and quantity of food he was given while he was on lockdown is not supported by any objective evidence of record. In sum, Plaintiff has failed to establish a genuine issue of material fact that the conditions in disciplinary isolation and administrative segregation imposed an "atypical and significant hardship" on him which triggered due process protections. This portion of Defendants' Motion should be **GRANTED**.

AO 72A
(Rev. 8/82)

It is unnecessary to address the remainder of Defendants' Motion for Summary Judgment.

## CONCLUSION

Based on the foregoing, it is my **RECOMMENDATION** that Defendants' Motion for Summary Judgment be **GRANTED** and Plaintiff's Complaint be **DISMISSED**.

**SO REPORTED** and **RECOMMENDED**, this 15th day of April, 2010.

JAMES E. GRAHAM
UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev. 8/82)